Frank **CARDER**, Sr., Frank Carder, Jr. and Ben Scroggin, Jr., Plaintiffs,

v.

**TYLER BANK & TRUST COMPANY,**
Defendant.

Civ. A. No. 1691.

United States District Court
E. D. Texas, Tyler Division.
July 15, 1954.

Charles F. Potter, Spruiell, Lowry, Potter & Lasater, Tyler, Tex.; for plaintiffs.

W. Dewey Lawrence, Wm. D. Lawrence, Jr., Tyler, Tex., for defendant.

SHEEHY, Chief Judge.

The Plaintiffs instituted this suit in this Court seeking to recover from the Defendant the sum of $10,250, the aggregate amount of four drafts which will hereinafter be described and designated.

The Plaintiffs, and each of them, are residents and citizens of the State of Arkansas. The Defendant is a banking corporation duly incorporated under the laws of the State of Texas with its principal place of business in Tyler, Smith County, Texas.

The Court has jurisdiction of this cause under the provisions of Title 28 U.S.C.A. § 1332.

The pertinent facts, as found, are as follows:

During all times pertinent hereto the Plaintiffs, Frank Carder, Sr. and Frank Carder, Jr. were doing business in the name of "Carder Motor Company" and "Carder Buick Company" with their place of business located in Searcy, Arkansas. During all times pertinent hereto the Plaintiffs, Frank Carder, Sr., Frank Carder, Jr. and Ben Scroggin, Jr., were doing business in the names of "Ben Scroggin Motors", "Ben Scroggin Mercury" and "Ben Scroggin Mercury Company" with the place of business located in Searcy, Arkansas. During all times pertinent hereto up to, on or about September 21, 1953 one Johnny T. Camp, hereinafter referred to as Camp, was engaged in the business of buying and selling automobiles and operated said business under the name of "J–C Motors" with the office and sale lot of said business being located in Tyler, Texas. From sometime in 1952 up to, on or about September 21, 1953 Camp carried an account under the name of "J–C Motors" with the Defendant Bank, which bank will be hereinafter referred to, unless otherwise designated, as the Tyler Bank. During all times pertinent hereto Frank Carder, Sr. and Frank Carder, Jr. were customers of and carried an account with the Searcy Bank at Searcy, Arkansas, hereinafter referred to as the Searcy Bank, under the name of Carder Motor Company. During all times pertinent hereto the Plaintiffs, Frank Carder, Sr., Frank Carder, Jr. and Ben Scroggin, Jr. were customers of the Searcy Bank and carried an account with that bank under the name of Ben Scroggin Mercury. The Worthen Bank and Trust Company of Little Rock, Arkansas, hereinafter referred to as the Worthen Bank was during all of the year 1953 the regular correspondent bank of the Searcy Bank. The Tyler Bank is not a correspondent bank of either the Worthen Bank or the Searcy Bank and at no time pertinent hereto did either the Searcy Bank or the Worthen Bank have an account with the Tyler Bank or did the Tyler Bank have an account with either the Worthen Bank or the Searcy Bank. Over a period of several years prior to September, 1953 Camp had from time to time purchased automobiles from the Plaintiffs and over that period of time purchased a rather large number of automobiles from the Plaintiffs. Generally speaking, the purchase of automobiles by Camp from the Plaintiffs was handled substantially in the following manner: Camp would contact one of the Plaintiffs by telephone or otherwise and agree to purchase a given automobile. This automobile was then delivered by Plaintiffs to either Camp or one of Camp's employees together with Plaintiffs' invoice showing the sale of

said automobile to Camp and an executed bill of sale of said automobile from Plaintiffs to Camp. Either simultaneously with the delivery of the automobile by Plaintiffs to Camp or within a short time thereafter Camp would either deliver to Plaintiffs a draft similar to the drafts herein involved, and which will be hereinafter described, signed by Camp payable to Plaintiffs in the amount of the purchase price of the automobile and drawn on the bank with which Camp had an account, which bank from sometime in 1952 up through the dates of the transactions herein involved was the Tyler Bank, or one of the Plaintiffs, with authority from Camp to so do, would draw a draft payable to Plaintiffs in the amount of the sale price of the automobile on Camp's bank, which draft would be signed J–C Motors by the Plaintiff who drew the particular draft. The Plaintiffs would then take the draft, with title papers, including the manufacturer's certificate of title, to the Searcy Bank for deposit to their account. The Searcy Bank would credit the Plaintiffs' account with the amount of the draft and then forward same, with the title papers attached, to the Worthen Bank. The Worthen Bank, upon receipt of said draft, would credit the Searcy Bank's account with the amount of the draft and would then forward the draft, with title papers attached, by mail to Camp's bank for collection. Upon receipt of the draft by Camp's bank Camp would be notified by his bank and Camp would then inspect the title papers attached to said draft and if same were found to be in order, he would then pay said draft by giving his bank a check on his account in his bank for the amount of said draft.

On or about August 24, 1953 in a telephone conversation between Camp and Frank Carder, Sr. Camp agreed to purchase from Ben Scroggin Mercury a 1953 Mercury automobile for the sum of $2,-400. This Mercury automobile was delivered by Plaintiffs to an employee of Camp at Searcy, Arkansas on August 25, 1953 and simultaneously with the delivery of said automobile to Camp's said employee a signed copy of Ben Scroggin Mercury Invoice No. 2239, dated August 25, 1953, reflecting the sale of said Mercury automobile to Camp by Ben Scroggin Mercury and a bill of sale from Ben Scroggin Mercury to Camp covering said automobile were delivered to Camp's employee. Either simultaneously with the delivery of the said Mercury automobile by Plaintiffs to Camp's employee or shortly thereafter, the exact time not being shown by the evidence, Camp delivered or caused to be delivered to Plaintiffs a draft signed by Camp in the amount of $2,400, which draft was dated August 24, 1953. This draft was in the form of an envelope that was subject to being sealed and on the outside of the envelope was a printed form draft designated as "Customer's Draft". The draft showed on its face it was for a 1953 Mercury automobile and was payable to the order of Ben Scroggin Motors in the amount of $2,400, and designated Tyler Bank as the drawee bank. The drawer of the draft was shown to be J–C Motors (written by typewriter) with Camp's personal signature under the words "J–C Motors". This draft was introduced in evidence as Plaintiffs' Exhibit P–5 and for convenience will be hereinafter referred to as Draft P–5.

After receiving Draft P–5 the Plaintiffs placed in the draft envelope the manufacturer's certificate of title and the original signed invoice of Ben Scroggin Mercury showing the transfer of said automobile to Camp and then sealed the draft envelope. On September 11, 1953 the Plaintiffs presented said draft to the Searcy Bank and the Searcy Bank immediately credited the account of Ben Scroggin Mercury with $2,400, the face amount of the draft. On the same day the Searcy Bank forwarded said draft to the Worthen Bank. This draft was received by the Worthen Bank on September 12, 1953 and, upon receipt of said draft, the Worthen Bank immediately credited the account of the Searcy Bank with the face amount of said draft.

On or about August 31, 1953 in a telephone conversation between Camp and Frank Carder, Sr. it was agreed that Plaintiffs would sell and Camp would buy a 1953 Mercury automobile for the sum of $2,450. Plaintiffs delivered this automobile to Camp or one of his employees in Searcy, Arkansas on August 31, 1953 and simultaneously with the delivery of said car the Plaintiffs delivered to either Camp or Camp's employee a signed Invoice No. 3153 reflecting that Ben Scroggin Mercury had sold to Camp said Mercury automobile together with an executed Bill of Sale of said automobile from Ben Scroggin Mercury to Camp. Either simultaneously with the delivery of said car by Plaintiffs to Camp or within a short time thereafter Camp delivered or caused to be delivered to Plaintiffs a draft, dated August 31, 1953, payable to the order of Ben Scroggin Mercury in the sum of $2,450, which draft showed the drawer as J–C Motors and was signed personally by Camp. The drawee bank as shown on said draft was the Tyler Bank. This draft was on the envelope form identical with the envelope form used for Draft P–5, above referred to. This draft was introduced in evidence as Plaintiffs' Exhibit P–6 and will be hereinafter referred to as Draft P–6. Subsequent to the receipt of Draft P–6 the Plaintiffs placed in the draft envelope the manufacturer's certificate of title covering said Mercury automobile, together with an executed copy of Ben Scroggin Mercury Invoice No. 2247, dated August 31, 1953, reflecting the sale of said Mercury automobile by Ben Scroggin Mercury to Camp and sealed said envelope. On September 11, 1953 the Plaintiffs presented said draft, with the title papers attached, to the Searcy Bank and the Searcy Bank on that date credited the account of Ben Scroggin Mercury with the face amount of said draft and on that date the Searcy Bank forwarded said draft, with the title papers attached, to the Worthen Bank. The Worthen Bank received the draft on September 12, 1953 and immediately credited the account of the Searcy Bank with the face amount of said draft.

On or about August 25, 1953 in a telephone conversation between Camp and Frank Carder, Sr. Plaintiffs agreed to sell and Camp agreed to buy a certain Buick automobile for the sum of $2,700 and on August 25, 1953 Plaintiffs delivered to either Camp or Camp's employee a signed invoice of Carder Buick Company, dated August 25, 1953, reflecting the sale of said Buick automobile by Carder Buick Company to Camp, together with an executed Bill of Sale of said Buick automobile from Carder Motor Company to J–C Motors. On August 28, 1953 the Plaintiffs presented to the Searcy Bank a draft in the amount of $2,700. This draft was introduced in evidence as Plaintiffs' Exhibit P–3A and will be hereinafter referred to as Draft P–3A. This draft was on an envelope form substantially the same as the envelope form used for Drafts P–5 and P–6, above-mentioned, and was payable to Carder Motor Company in the sum of $2,700. The drawee bank as shown on that draft was the Tyler Bank and the draft was signed J–C Motors by Frank Carder, Sr. and was to be in payment for the Buick automobile mentioned in this paragraph. When this draft was presented to the Searcy Bank on August 28, 1953, there was contained in the envelope sealed the manufacturer's certificate of title to the Buick automobile mentioned in this paragraph, a Bill of Sale from Carder Motor Company to J–C Motors covering said Buick automobile and a signed invoice of Carder Buick Company, dated August 25, 1953, reflecting the sale of said Buick automobile to Camp. Upon presentment of the draft to the Searcy Bank the Searcy Bank immediately credited the account of Carder Motor Company with the face amount of said draft and on that date forwarded said draft, with title papers attached, to the Worthen Bank. The Worthen Bank received said draft on August 29, 1953 and immediately credited the account of the Searcy Bank with the face amount of the draft. On the same date it received said draft the Worthen Bank mailed said draft, with title papers attached, to the Tyler Bank and the draft was received by the Tyler Bank on

August 31, 1953. The Tyler Bank, upon receipt of said Draft P–3A, notified Camp of the receipt of said draft. On or before September 9, 1953 Camp inspected the title papers attached to Draft P–3A and because he found a defect in the manner in which some of the title papers were executed he refused to either pay or authorize the Tyler Bank to pay said draft and requested the Tyler Bank to return said draft. On September 9, 1953 the Tyler Bank returned said draft unpaid to the Worthen Bank and the Worthen Bank in turn returned said draft to the Searcy Bank. When the returned draft reached the Worthen Bank, the Worthen Bank debited the account of the Searcy Bank with the amount of the draft and when the returned draft was received by the Searcy Bank, that bank debited the account of the Carder Motor Company with the amount of said draft.

When Draft P–3A was returned to the Searcy Bank, the Plaintiffs corrected the title papers to the Buick automobile and Frank Carder, Sr. prepared à draft, dated September 10, 1953, as a substitute for Draft P–3A, which draft has been introduced in evidence as Plaintiffs' Exhibit P–3 and will hereinafter be referred to as Draft P–3. Draft P–3 was on the identical form as was Draft P–3A and is identical with Draft P–3A except as to the date of the draft. Draft P–3, with the appropriate title papers sealed in the envelope thereof, was presented to the Searcy Bank by Plaintiffs on September 10, 1953 and the Searcy Bank on that date credited the account of Carder Motor Company with $2,700, the face amount of said draft, and forwarded same, with the title papers attached, to the Worthen Bank. Draft P–3, with title papers attached, was received by the Worthen Bank on September 11, 1953 and, upon receipt of said draft, the Worthen Bank immediately credited the account of the Searcy Bank with the face amount of said draft.

In a telephone conversation between Frank Carder, Sr. and Camp on or about August 30, 1953 Plaintiffs agreed to sell and Camp agreed to buy a certain Buick automobile for the sum of $2,700. This Buick automobile was delivered by Plaintiffs to either Camp or Camp's employee on August 31, 1953 in Searcy, Arkansas. Simultaneously with said delivery of said automobile the Plaintiffs delivered to either Camp or Camp's employee, a signed Carder Buick Company invoice, dated August 31, 1953, showing the sale of said Buick automobile by Carder Buick Company to J–C Motors, together with a signed Bill of Sale from Carder Buick Company to J–C Motors covering said automobile. On or about August 31, 1953 Camp delivered or caused to be delivered to Carder Buick Company a draft in the amount of $2,700 which was to be in payment for said last-mentioned Buick automobile. This draft, which was offered in evidence as Plaintiffs' Exhibit P–4A and which will be hereinafter referred to as Draft P–4A, was on an envelope draft form identical with the draft form used for Draft P–5, above-mentioned. Draft P–4A was dated August 30, 1953 and was payable to the order of Carder Motor Company and showed the drawee bank to be the Tyler Bank. The draft was drawn on the account of J–C Motors and was signed by Camp personally. On September 1, 1953 said Draft P–4A, with certificate of title, Bill of Sale from Carder Motor Company to J–C Motors and signed invoice of Carder Buick Company, dated August 31, 1953 covering said Buick automobile sealed in said draft envelope, was presented to the Searcy Bank by Plaintiffs. The Searcy Bank immediately credited the account of Carder Buick Company with the face amount of said draft and on September 1, 1953 forwarded said draft, with title papers attached, to the Worthen Bank. The Worthen Bank received said draft on September 2, 1953 and on that date credited the account of the Searcy Bank with the face amount of said draft and immediately mailed same, with title papers attached, to the Tyler Bank. The Tyler Bank received this draft on September 4, 1953 and on that date exhibited said draft, with title papers attached, to Camp. Camp, upon examination of the title papers, found a defect in the execu-

tion of some of the title papers and refused to either pay said draft or authorize the Tyler Bank to pay same and requested the Tyler Bank to return said draft. On September 4, 1953 the Tyler Bank returned said Draft P-4A unpaid by mail to the Worthen Bank. Upon receipt of said returned draft the Worthen Bank debited the account of the Searcy Bank with the face amount of said draft and returned said draft to the Searcy Bank. The Searcy Bank, upon receipt of said returned draft debited the account of Carder Motor Company with the face amount of said draft.

On September 11, 1953 the Plaintiffs presented a draft in the amount of $2,700 to the Searcy Bank, which draft was introduced in evidence as Plaintiffs' Exhibit P-4 and will be hereinafter referred to as Draft P-4. Draft P-4 was dated September 11, 1953 and was a substitute for Draft P-4A, above-mentioned. Draft P-4 was in the identical form as was Draft P-3, above-mentioned, and was payable to the Carder Motor Company. The drawee bank was the Tyler Bank and the draft showed J-C Motors to be the drawer and was signed by Frank C. Carder, Sr. Draft P-4, with the corrected title papers to the Buick automobile delivered by Plaintiffs to Camp on August 31, 1953, above-referred to, sealed in the draft envelope, was presented to the Searcy Bank on September 11, 1953. The Searcy Bank immediately credited the account of Carder Buick Company with the face amount of said draft and on that date forwarded said draft with the title papers attached to the Worthen Bank. The Worthen Bank received said draft on September 12, 1953 and immediately credited the account of the Searcy Bank with the face amount of said draft.

On September 11, 1953 the Worthen Bank forwarded by mail to the Tyler Bank Draft P-3, with title papers attached, for collection and remittance when paid. Said draft was forwarded to the Tyler Bank with a printed form letter of the Worthen Bank denominated as "Cash Letter". On September 12, 1953 the Worthen Bank forwarded by mail to the Tyler Bank, with its form cash letter, Drafts P-4, P-5 and P-6 for collection and remittance when paid. No instructions other than the instructions contained in the Worthen Bank's printed form cash letter were given to the Tyler Bank in connection with Drafts P-3, P-4, P-5 and P-6. The printed form cash letter stated among other things "Please do not hold collections for the convenience of parties". The printed instructions further requested, in effect, that the Tyler Bank wire the Worthen Bank nonpayment of items such as the drafts in question. The four drafts, last-mentioned, were received by the Tyler Bank on September 14, 1953 but the exact hour of the receipt of said drafts by the Tyler Bank is not shown by the evidence. Either on September 14, 15, or 16, 1953 the Tyler Bank advised Camp of the four drafts it received from the Worthen Bank on September 14, 1953 and when Camp was so advised, Camp asked an officer of the Tyler Bank if the drafts could be held over another day and the officer advised Camp that said drafts could be held over another day. Camp never did pay said drafts, above-mentioned, or any of them, and did not authorize the Tyler Bank to pay said drafts, or any of them. The reason why Camp did not pay said drafts or authorize their payment was that he did not have the funds with which to pay said drafts, or any of them, and Camp at no time while Drafts P-3, P-4, P-5 and P-6 were in the Tyler Bank had funds with which to pay said drafts, or any of them. On September 18, 1953 the Tyler Bank returned Drafts P-3, P-4, P-5 and P-6 by mail advising the Worthen Bank that it was unable to collect said drafts. These returned drafts were received by the Worthen Bank on September 21, 1953. The Worthen Bank, upon receipt of said returned drafts debited the account of the Searcy Bank with the face amount of said drafts and immediately forwarded said drafts to the Searcy Bank. The Searcy Bank immediately, upon receipt of said returned drafts, debited the account of Carder Buick Company with the face amount of Drafts P-3 and P-4 and debited the account of Ben Scroggin

Mercury with the face amount of Drafts P–5 and P–6. The Tyler Bank at no time advised the Worthen Bank by wire that the drafts could not be collected.

Camp sold the Buick automobile, for which Draft P–3 was given in payment, in the State of Louisiana on August 28, 1953. He sold the Buick automobile, for which Draft P–4 was given in payment, in the State of Louisiana on September 4, 1953 and he sold the two Mercury automobiles, for which Drafts P–5 and P–6, respectively, were given in payment, in the State of Louisiana on September 11, 1953. In selling these automobiles, and each of them, Camp used the Bill of Sale and the invoice given him by the Plaintiffs at the time each of the automobiles were delivered to him and in passing the titles to said automobiles to the purchasers thereof in the State of Louisiana. In the absence of having such Bills of Sale and invoices Camp would not have been able to sell said automobiles as he did sell them.

September 14, 1953 fell on Monday and there was no holiday during the week of September 14, 1954.

Frank Carder, Sr. was authorized by Camp to draw and sign Drafts P–3, P–3A and P–4. The Tyler Bank had no authority from Camp to pay the drafts herein involved without specific authorization from Camp to pay same.

The envelope form draft used for the drafts here in question is in a form that is customarily and generally used throughout the banking business in connection with the buying and selling of automobiles. At the time of each of the transactions herein involved and for a long time prior thereto it was the customary practice in the banking business for banks, particularly banks handling a substantial volume of drafts drawn and presented in connection with the sale of automobiles, receiving for collection drafts like the drafts herein involved and in the manner the Tyler Bank received the drafts in question for collection to hold said drafts for four or five days, and in some instances longer, before returning said drafts to the forwarding agency in an effort to collect said drafts. The Tyler Bank at all times pertinent hereto was handling a substantial volume of drafts of the nature of those herein involved and it was in keeping with the practice and custom just mentioned that the Tyler Bank held Drafts P–3, P–4, P–5 and P–6 from the time it received them on September 14, 1953 to the time it returned them by mail on September 18, 1953 to the Worthen Bank.

As above indicated, the Plaintiffs learned on September 21, 1953 that Drafts P–3, P–4, P–5 and P–6 had been returned by the Tyler Bank uncollected and on September 22, 1953 Frank Carder, Sr. came to Tyler in an effort to either recover the four automobiles, for which said four drafts had been given in payment, or to collect the drafts. While in Tyler Carder ascertained that the four automobiles had been sold by Camp in the State of Louisiana and were then in the hands of innocent purchasers. From a date as early as on or about September 5, 1953 until this date Camp has been insolvent. On September 21, 1953 Camp had in his possession several automobiles to which he had title and the value of these automobiles was approximately $2,-500. These automobiles were seized or taken by other creditors of Camp other than the Plaintiffs. The Plaintiffs have not been paid any part of the drafts herein involved and prior to the institution of this suit the Plaintiffs made demand on the Tyler Bank for the payment of said drafts and the Tyler Bank at all times has refused to pay said drafts or any part thereof. The Worthen Bank and the Searcy Bank have assigned to Plaintiffs any and all claims that they have or might have against the Tyler Bank because the drafts herein involved were not paid.

Although in the many dealings that Camp had with the Plaintiffs prior to the sale by Plaintiffs to Camp of the four automobiles herein involved the drafts given by Camp in payment for said automobiles were handled in the same or substantially the same manner as the drafts here in question were handled, each of

the drafts given prior to the time the drafts here in question were given was paid by the Tyler Bank and the Plaintiffs had no knowledge as to how long the Tyler Bank may have held any of said drafts before they were paid or whether any of said drafts were held by the Tyler Bank longer than twenty-four hours after the receipt of same by the Tyler Bank.

The Plaintiffs contend that the Defendant is liable to them for the face amount of the four drafts herein involved because the Defendant by holding said drafts for more than twenty-four hours from the time they were received by it accepted the same under the provisions of The Texas Banking Code of 1943, Vernon's Ann.Civ.St. art. 342–101 et seq., and in the alternative contend that Defendant was guilty of negligence in holding said drafts from the time it received them on September 14, 1953 to the time it returned them on September 18, 1953 and that such negligence was a proximate cause of Plaintiffs' loss. The Defendant denies that it accepted said drafts within the meaning of The Texas Banking Code of 1943, denies it was guilty of any negligence charged by the Plaintiffs and contends that the Plaintiffs in placing the four automobiles in question in the hands of Camp with receipted invoices and bills of sale reflecting the sale of said automobiles, and each of them, by the Plaintiffs to Camp were guilty of negligence and that such negligence was a proximate cause of Plaintiffs' loss.

Subsequent to the closing of the evidence in this case and while the Court had the case under advisement the Defendant, with leave of the Court being had, filed its First Supplemental Answer and Trial Amendment wherein it alleged as additional defenses that the Plaintiffs were estopped from claiming that the Defendant accepted the drafts in question and further that the Plaintiffs had waived their right to claim that the Defendant, by keeping the drafts in question more than twenty-four hours after receipt of same, had accepted said drafts. As I construe this Supplemental Answer and Trial Amendment the Defendant's claim of estoppel and waiver is based on a contention that the drafts given by Camp to Plaintiffs for the payment of automobiles purchased by Camp from the Plaintiffs prior to the transactions in question were handled in substantially the same way as the drafts in question were handled and in many instances were held by the Tyler Bank for more than twenty-four hours before they were paid and the Plaintiffs, because of their failure to complain about the conduct of the Tyler Bank in holding such prior drafts for more than twenty-four hours, had led and induced the Defendant to handle the drafts in question in the manner in which they were handled.

■ As to the negligence charged by the respective parties, I find and conclude that the Defendant was not guilty of negligence in the manner charged by the Plaintiffs and I further find and conclude that the Plaintiffs were guilty of negligence in delivering the automobiles in question to Camp along with receipted invoices and bills of sale showing the sale of each automobile by Plaintiffs to Camp and that such negligence was a proximate cause of the Plaintiffs' loss.

The question left for consideration is whether the Defendant by virtue of the provisions of the Texas Banking Code of 1943, Title 16, Vernon's Revised Civil Statutes of Texas, accepted the drafts in question and is liable for the amounts thereof. Article 342–704, Revised Civil Statutes of Texas (a part of the Texas Banking Code of 1943) provides in part as follows:

"Except where otherwise provided in this Code, or by express agreement of the parties, items presented to a drawee bank shall be received by it, subject to final adjustments and all clearing house settlements, checks, drafts, credits, advances of money, charges or entries to accounts, (including sight posting), shall be conditional and subject to revocation during the day on which the item is presented (or in case of a time item, the due date), or with-

in twenty-four (24) hours after presentment, exclusive of Sundays and holidays, if it is finally determined that the drawee bank was not at the time of presentment (or in case of a time item, the due date) authorized or obligated to pay the item, and if the drawee bank shall within that time refuse payment and return the item, or undertake to give notice in the manner hereinafter prescribed:

"1. * * *

"2. * * *

"3. If the item is presented by mail, the drawee bank shall within the time above prescribed deposit the item in the mail properly stamped and addressed to the bank or person presenting the same. * * If the drawee bank in refusing payment of any item fails to comply with the provisions of this article within the time above prescribed it shall, at the election of the owner of the item, be deemed to have accepted the item, and shall be liable for the amount thereof. * * * "

■ This Banking Code, Article 342–701, subsection (d) of the R.C.S. of Texas, defines the term "item" as used in the statute, above-quoted, as meaning a check, note or other negotiable or non-negotiable instrument providing for the payment of money. This definition is sufficiently broad to include the drafts herein involved. Unquestionably, the Plaintiffs are the owners of the drafts herein involved within the meaning of the Texas Banking Code. Article 342–701, subsection (c), R.C.S. of Texas.

■ It would appear that there is only one reported Texas case construing the above-quoted provisions of Article 342–704. That is the case of City State Bank in Wellington v. National Bank of Commerce of Altus, Okl., Tex.Civ.App., 261 S.W.2d 749, 754, (Writ of Error Refused NRE). The court in that case in construing the provisions of Article 342–704, R.C.S. of Texas, above-quoted, stated:

"The proper construction of Art. 342–704, Vernon's Ann.Civ.St., seems to be that in order to escape liability for the amount of an item presented to a drawee bank by mail, and the drawee bank determines that it is not obligated at the time of presentment to pay it, it must, during the day the item is presented, or within twenty-four hours after presentment, deposit the item in the mail, properly stamped and addressed to the bank or the person presenting the same."

After a careful study of the Texas Banking Code of 1943 I have concluded that under the facts in this case and in light of the provisions of Article 342–704 of the R.C.S. of Texas it was the duty of the Defendant to either deposit the drafts in the mail properly stamped and addressed to the Worthen Bank the day the drafts were received by the Defendant or within twenty-four hours after they were received by the Defendant. This, the Defendant did not do and the Plaintiffs having elected to assert an acceptance by the Defendant of said drafts the Defendant under the provisions of subsection 3, Article 342–704, supra, is deemed to have accepted the four drafts in question and is liable to the Plaintiffs for the amounts of said drafts. This is true even though the Defendant in holding the drafts the length of time it held same was following a custom and practice that was prevalent throughout the banking business. Such a custom and practice cannot abrogate the statutory law.

■ The Plaintiffs are not estopped from asserting that the Defendant, by holding the drafts in question more than twenty-four hours before returning same to the Worthen Bank, accepted same in light of the provisions of Article 342–704, Revised Civil Statutes of Texas. As above indicated, the Plaintiffs had no knowledge prior to the handling of the drafts in question that the Tyler Bank was holding drafts of this nature more than twenty-four hours in order to col-

lect same. There is no evidence that either the Searcy Bank or the Worthen Bank had any knowledge of the fact that the Tyler Bank was holding Camp's drafts, similar to the drafts in question, more than twenty-four hours for collection prior to the time the drafts in question were presented to the Tyler Bank for collection. Likewise the Plaintiffs have not waived their right to elect to assert that the Tyler Bank, by holding the drafts in question for more than twenty-four hours, accepted same and is liable to the Plaintiffs for the amount thereof.

Judgment will be entered herein against the Defendant and in favor of the Plaintiffs for the sum of $10,250, the aggregate amount of the four drafts herein involved, and for their costs in this behalf expended.

This Memorandum Opinion will constitute the Findings of Fact and Conclusions of Law herein as authorized by Rule 52, F.R.C.P., 28 U.S.C.A.